EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| CMI Hospital Equipment Corp.<br><br>Recurrido<br><br>vs.<br><br>Departamento de Salud, Estado Libre Asociado de Puerto Rico; Etc.<br><br>Peticionarios | Certiorari<br><br>2007 TSPR 99<br><br>171 DPR ____ |

Número del Caso: CC-2005-434

Fecha: 30 de mayo de 2007

Tribunal de Apelaciones:

      Región Judicial de San Juan Panel II

Juez Ponente:

      Hon. Carlos Rivera Martínez

Oficina del Procurador General:

      Lcdo. Guillermo A. Mangual Amador
      Procurador General Auxilair

Abogado de la Parte Recurrida:

      Lcdo. Roberto Corretjer Piquer

Materia: Cobro de Dinero y Enriquecimiento Injusto

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

CMI Hospital Equipment
Corp.

    Recurrido

        vs.                   CC-2005-434     Certiorari

Departamento de Salud,
Estado Libre Asociado de
Puerto Rico; Etc.

    Peticionarios

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico, a 30 de mayo de 2007.

Tenemos la ocasión de aplicar la normativa sobre la equidad, en el contexto de una singular acción gubernamental, a saber, cuando el Gobierno actúa en virtud de una autorización del Tribunal de Quiebras de los Estados Unidos para el Distrito de Puerto Rico.

I

El 26 de marzo de 1998 CMI Hospital Equipment Corp. (en adelante CMI) y Servicios Integrados de Medicina Avanzada de Humacao, Inc. (en adelante SIMAH) suscribieron un contrato de arrendamiento de maquinaria y equipo perteneciente a CMI. La propiedad en cuestión sería instalada y utilizada en

el Hospital de Medicina Integrada de Humacao y en los Centros de Medicina Integrada de Juncos, Yabucoa, Las Piedras y Naguabo. En el referido contrato SIMAH se obligó a pagar a CMI un canon de arrendamiento de $17,000 mensuales por un término de 5 años.[1]

A menos de 3 meses después de firmado el contrato, el 9 de junio de 1998, SIMAH presentó ante el Tribunal de Quiebras de los Estados Unidos para el Distrito de Puerto Rico (en adelante Tribunal de Quiebras) una petición al amparo del Capítulo 11 del Código de Quiebras.[2] Posteriormente, SIMAH solicitó la liquidación total de sus activos bajo el Capítulo 7 del Código de Quiebras.

Tanto CMI como el Departamento de Salud (en adelante el Departamento) comparecieron como acreedores de SIMAH en el procedimiento ante el Tribunal de Quiebras. El 10 de julio de 1998, a solicitud del Departamento, el Tribunal de Quiebras ordenó como remedio provisional urgente que se realizara un inventario de todo el equipo en posesión de SIMAH y que se prohibiera su remoción sin previa autorización judicial. Además, autorizó al Departamento a proveer servicios médico-hospitalarios de emergencia en todos los centros que eran administrados por SIMAH.

El 22 de julio de 1998, con el propósito de continuar prestando los servicios referidos, el Departamento y SIMAH

---

[1] En el contrato se pactó que dicho término comenzaría a contarse a partir del 5 de abril de 1998.

[2] *In the Matter of*: Servicios Integrados de Medicina Avanzada de Humacao, Inc., caso núm. 98-07676.

solicitaron conjuntamente que el Tribunal de Quiebras permitiera al Departamento **tomar el control, sin limitación alguna**, de las facilidades médico-hospitalarias administradas por SIMAH, incluyendo aquellas donde se encontraban instalados los equipos de CMI. **CMI no fue parte del acuerdo entre SIMAH y el Departamento.** El 23 de julio de 1998 el Tribunal de Quiebras emitió una orden mediante la cual concedió lo solicitado, con fecha retroactiva al 17 de julio de 1998. Como consecuencia de esto, los equipos de CMI pasaron a ser usados exclusivamente por el Departamento.

El 4 de febrero de 1999 SIMAH presentó ante el Tribunal de Quiebras una moción titulada "Motion for Rejection of Executory Contract". El 11 de febrero de 1999 ese tribunal emitió una orden mediante la cual determinó que el contrato entre CMI y SIMAH había sido rechazado y el equipo de CMI fue abandonado, según permite la sección 365 del Código de Quiebras.

El 22 de junio de 2001, luego de que el Departamento no pagara ningún canon de arrendamiento por el uso de los equipos en cuestión, ni devolviera éstos a pesar de habérsele requerido en varias ocasiones, CMI presentó una demanda sobre cobro de dinero y enriquecimiento injusto contra el Departamento, el Estado Libre Asociado (en adelante ELA) y sus respectivas compañías aseguradoras ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En su demanda, CMI alegó que debido a que el

Departamento era quien ahora estaba en control, posesión y uso de los equipos, estaba también llamado a responder por las rentas adeudadas. El Departamento a su vez adujo, entre otras defensas, que la deuda en cuestión no era exigible debido a que no existía ningún contrato escrito sobre el particular entre el Departamento y CMI.

Después de diversos trámites procesales, el 10 de enero de 2003, CMI presentó una moción de sentencia sumaria. El ELA, a su vez, presentó una moción de desestimación y solicitó que se dictara sentencia sumaria a su favor. El 24 de abril de 2003 el Tribunal de Primera Instancia emitió una sentencia sumaria parcial mediante la cual desestimó la demanda y ordenó a CMI a pagar las costas y los honorarios de abogado. El foro de instancia basó su determinación en la inexistencia de un contrato escrito entre el Departamento y CMI y en que el equipo reclamado formaba parte del caudal de quiebras, por lo cual aplicaba la paralización automática que establece el Código de Quiebras.

El 29 de mayo de 2003 CMI presentó una solicitud de determinaciones de hechos adicionales y pidió que se dictara una sentencia sumaria a su favor. El Tribunal de Primera Instancia celebró una vista argumentativa a solicitud de las partes. El 9 de marzo de 2004, después de evaluar los planteamientos de ambas partes, el foro de instancia dictó una sentencia parcial enmendada en reconsideración, mediante la cual concedió lo solicitado

por CMI. El tribunal expresó en su dictamen que no era de aplicación aquí la paralización automática porque el equipo había quedado fuera del caudal de quiebras, al ser abandonado por SIMAH en el proceso ante el Tribunal de Quiebras. Además, determinó que el Departamento había asumido las obligaciones que tenía SIMAH con CMI cuando solicitó y obtuvo el control de las facilidades sin limitaciones. Por estas razones, el tribunal de instancia le impuso responsabilidad al Departamento por el equipo desde el 17 de julio de 1998, momento en que asumió el control referido, y le ordenó a pagar la renta correspondiente hasta el momento en que devolviese el equipo a CMI.

Por no estar de acuerdo con la determinación del Tribunal de Primera Instancia, el Departamento solicitó su reconsideración ante dicho foro, la cual fue denegada mediante una Resolución del 15 de abril del 2004. Aún inconforme, el 20 de mayo de 2004 el Departamento presentó un escrito de *certiorari* ante el Tribunal de Apelaciones, en el que le imputó al foro de instancia haber errado al dictar una sentencia sumaria a favor de CMI cuando no había controversia en cuanto a que no existía contrato escrito alguno que impusiere responsabilidad al Estado, y el Estado no había asumido dicha obligación de modo alguno.

El Tribunal de Apelaciones, en una sentencia del 17 de febrero de 2005, confirmó la del Tribunal de Primera Instancia y determinó (1) que la orden emitida por el

Tribunal de Quiebras, mediante la que concedió la solicitud de rechazo del contrato entre SIMAH y CMI, tuvo el efecto de que el equipo de CMI quedara fuera del caudal de quiebras, dejando inoperante la aplicación de la paralización automática;[3] (2) que cuando el Departamento solicitó operar las facilidades sin limitaciones, no se opuso ni rechazó el contrato de arrendamiento vigente;[4] y (3) que en este caso se daban los elementos para la aplicación de la doctrina de enriquecimiento injusto.

Inconforme con la determinación del Tribunal de Apelaciones, el Departamento presentó una moción de reconsideración ante dicho foro, la cual fue declarada No Ha Lugar mediante una Resolución del 13 de abril de 2005. No conforme tampoco con esta determinación, el 12 de mayo de 2005 el Departamento presentó ante nuestra consideración un recurso de *certiorari*. En éste planteó, en síntesis, que el Tribunal de Apelaciones había errado: (1) al no revocar

---

[3] En cuanto a este punto, el foro apelativo señaló que, al rechazar el contrato, se creó una reclamación administrativa no asegurada de CMI contra SIMAH por incumplimiento de contrato. Esta reclamación comprende el periodo desde que SIMAH y CMI suscribieron el contrato hasta que SIMAH presentó su petición de quiebras. Esta reclamación es independiente a la reclamación por los cánones de arrendamiento adeudados por el Departamento desde que obtuvo la posesión, uso, disfrute y control del equipo.

[4] En cuanto a este punto, el Tribunal de Apelaciones explicó que no solamente el Departamento no se opuso al contrato, sino que usó el equipo ya que éste era necesario para operar las facilidades. El tribunal apelativo concluyó que al igual que el Departamento paga la renta de las facilidades y el salario de los empleados porque éstos son gastos indispensables para operar las facilidades, debe pagar por el uso de equipo considerado indispensable.

la sentencia recurrida y desestimar sumariamente la demanda, a pesar de la inexistencia de un contrato escrito que vinculara al Estado; (2) al resolver que era de aplicación la doctrina de enriquecimiento injusto, a pesar de que la reclamación de CMI no dimanaba de un contrato escrito con el Estado; y, (3) al resolver que la moción de rechazo del contrato y abandono del equipo presentada por SIMAH tuvo el efecto de excluir dicho contrato del caudal en quiebra.

El 5 de agosto de 2005 denegamos el recurso referido. El 24 de agosto de 2005 el Departamento solicitó la reconsideración de esa denegatoria, y el 4 de noviembre de 2005 reconsideramos y expedimos el recurso solicitado. El 31 de enero de 2006 notificamos a las partes que el caso había quedado sometido para su adjudicación. Con el beneficio de la comparecencia de éstas, procedemos a resolver.

## II.

El artículo 1 de la Ley Núm. 18 del 30 de octubre de 1975, 2 L.P.R.A. sec. 97 *et seq*, según enmendada por la Ley Núm. 127 del 31 de mayo de 2004, dispone que:

> Las entidades gubernamentales y las entidades municipales del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina de Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda.

En Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, interpretamos dicha disposición y establecimos los requisitos formales a seguirse al momento de contratar con un ente gubernamental, a saber, que:

> ...(1) [los contratos] se reduzcan a escrito; (2) se mantenga un registro fiel con miras a prima facie establecer su existencia; (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencias, y (4) se acredite la certeza de tiempo, esto es, haber sido realizado y otorgado quince (15) días antes. (Énfasis suprimido.)

Reiteradamente hemos expresado que estos preceptos demuestran la intención legislativa de crear un mecanismo de cotejo y publicidad de los contratos gubernamentales. Fernández & Gutiérrez v. Mun. San Juan, 147 D.P.R. 824, 830. La rigurosidad que se refleja en estas disposiciones responde al gran interés del Estado en promover una sana y recta administración pública mediante la prevención del despilfarro, la corrupción y el amiguismo en la contratación gubernamental. Las Marías v. Municipio San Juan, 159 D.P.R. 868, 875 (2003); Fernández & Gutiérrez v. Mun. San Juan, supra, pág. 829.

Los principios previamente mencionados han sido aplicados en casos en que partes privadas contratan con municipios. Hemos señalado que se presume que las partes que así contratan, conocen la necesidad de conducirse de acuerdo con las especificaciones de la ley. Ocasio v. Alcalde Mun. de Maunabo, supra; Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994); Fernández & Gutiérrez v. Mun. San

Juan, *supra*; Las Marías v. Municipio San Juan, *supra*; Ríos v. Municipio Isabela, 159 D.P.R. 839 (2003). El propósito que se persigue es que las partes privadas ejerzan un rol más activo al contratar con los municipios y exijan "prueba fehaciente de que el Gobierno cumplió con su deber". Las Marías v. Municipio San Juan, *supra*, pág. 880.

En el caso de autos, el Departamento ha alegado que no procedía la reclamación instada por CMI, ya que no estaba apoyada en un contrato por escrito y no se siguieron las formalidades aplicables a la contratación gubernamental. El Departamento ha citado, en apoyo de su planteamiento, los principios antes esbozados. No le asiste la razón.

Según señaláramos anteriormente, CMI suscribió un contrato de arrendamiento de maquinaria con SIMAH para que ésta instalara y usara dicho equipo en las facilidades que administraba. Es luego, mediante la solicitud conjunta del Departamento y SIMAH y a consecuencia de la orden emitida por el Tribunal de Quiebras, que el equipo pasó a ser controlado y administrado por el Departamento, por decisión propia de éste. Como puede deducirse de lo anterior, **CMI nunca tuvo la intención de contratar con el Departamento. El uso del equipo por parte del Departamento no surgió de una negociación entre CMI y éste, sino que fue el resultado de un procedimiento judicial formal ante el Tribunal de Quiebras. Debido a que CMI nunca llevó a cabo un contrato gubernamental, no tenía que cumplir con las formalidades establecidas para éstos.** Por lo tanto, tratándose de

<u>circunstancias extraordinarias</u> como las descritas anteriormente, no es de aplicación en el caso de autos la jurisprudencia citada por el Departamento.

## III.

El Departamento también nos ha planteado que erró el Tribunal de Apelaciones al determinar que el equipo de CMI quedó fuera del caudal de quiebras cuando se concedió la solicitud de rechazo del contrato entre SIMAH y CMI. No tiene razón el Departamento en su planteamiento. Veamos.

Al presentar una petición de quiebra, se crea inmediatamente un "bankruptcy estate" o caudal en quiebra, el cual consiste de toda la propiedad que estará sujeta a la jurisdicción del Tribunal de Quiebras. Para poder determinar los bienes que compondrán el caudal referido, el deudor tiene la obligación de incluir junto a la petición de quiebra un listado actualizado de sus activos y pasivos, y de sus ingresos y gastos. 11 U.S.C. sec. 362(a)(B).

La presentación de dicha petición también conlleva la paralización automática de diversos procedimientos contra dicha parte. La paralización automática es una orden para cesar todas las gestiones de cobro, retención, embargo o ejecución de hipoteca contra una persona que ha solicitado acogerse a la protección de la ley de quiebras. Dentro de los procedimientos a los cuales aplicará la paralización automática se encuentra "cualquier acción para obtener la posesión de una propiedad que pertenezca al caudal o que

provenga del caudal, o para ejercer control sobre la propiedad del caudal". 11 U.S.C. sec. 362(a)(3).

El Código de Quiebras, en su sección 365, le da la facultad al síndico de rechazar ciertos contratos, si estimare que no son de provecho para el caudal. Por su parte, la sección 1107(a) le otorga esta misma facultad al deudor. La decisión de rechazar un contrato se encuentra en la sana discreción del deudor. W.L. Norton, *Norton Bankruptcy Law and Practice* 2d, Deerfield, Clark Boardman Callaghan, 1994, Vol. 3, Sec. 39:32, págs. 39-68. Si un contrato es rechazado, el caudal pierde todo interés o beneficio derivado de éste. Es decir, ese contrato es excluido y no forma parte del caudal.[5]

Cónsono con lo anterior, la sección 554 del Código de Quiebras establece el derecho del síndico (o del deudor) de abandonar una propiedad que considere una carga o que no sea beneficiosa para el caudal. El abandono de una propiedad ocurre después de que se celebre una vista, en la cual las partes tienen oportunidad de expresarse en cuanto a dicho abandono. Abandonar una propiedad tiene el efecto de excluirla del caudal en quiebra.[6]

---

[5] ...[S]uch lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor. 11 U.S.C. 365(d)(4)(A).

[6] ...[U]pon the abandonment under section 554, the trustee is simply divested of control of the property because it is no longer part of the estate. Thus, the abandonment constitutes a divesture of all of the estate's interest in the property. W.M. Collier, *Collier on Bankruptcy* (A.N. Resnick y H.J. Sommers), 15th ed., New York, Matthew Bender, 2001, Vol. 5, sec. 554.02, Págs. 554-5.

Sobre el concepto de abandono de una propiedad, en el proceso de quiebra, el destacado tratadista William Miller Collier expresa que:

> Although section 554 does not especify to whom property is abandoned, **property may be abandoned by the trustee, to any party with possessory interest. Normally, the debtor is the party with possessory interest. However, in some cases, it may be some other party** [...]. W.M. Collier, *Collier on Bankruptcy* (A.N. Resnick y H.J. Sommers), 15th ed., New York, Matthew Bender, 2001, Vol. 5, sec. 554.02, págs. 554-5.

En el caso ante nuestra consideración, SIMAH presentó una moción para rechazar el contrato suscrito con CMI. En dicha moción expresó que el referido contrato no era de ningún valor para el caudal y por tanto, lo rechazaba.[7] Además, SIMAH señaló que la propiedad sobre la cual versaba el contrato debía ser considerada abandonada. Por último, recalcó que ellos sólo tenían la posesión mediata de la propiedad, ya que la posesión inmediata la tenía el Departamento. Luego de analizar esta moción, el Tribunal de Quiebras emitió una orden concediendo la petición referida. **Al conceder la solicitud de rechazo, el contrato de arrendamiento y el equipo objeto del contrato quedaron fuera del caudal y por lo tanto, fuera de la jurisdicción del Tribunal de Quiebras. Por esta razón, la paralización automática no procede en cuanto a este contrato y equipo.**

---

[7] Como expresamos anteriormente, al rechazar el contrato, SIMAH incumplió con el mismo. De esta manera se creó una reclamación administrativa no asegurada de CMI contra SIMAH, la cual comprende el periodo desde que suscribieron el contrato hasta que SIMAH radicó su petición de quiebras.

Aparentemente consciente de lo anterior, el Departamento argumentó que cuando un síndico abandona una propiedad, la misma revierte al deudor. Sin embargo, los casos a los cuales el Departamento ha hecho referencia no son de aplicación aquí, ya que en el caso de autos fue el mismo deudor quien solicitó que se considerada la propiedad como abandonada. Además, es un hecho probado que la posesión inmediata del equipo, residía en el Departamento. Por lo tanto, no se cometió el error señalado.

IV

En múltiples ocasiones, hemos expresado que este Tribunal tiene la obligación de llenar las lagunas existentes en la ley, conforme al mandato del artículo 7 del Código Civil. Dicho artículo dispone que

> "[e]l Tribunal que rehúse fallar a pretexto de silencio, obscuridad, o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.
>
> **Cuando no haya ley aplicable al caso**, **el tribunal resolverá conforme a equidad**, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos". 31 L.P.R.A. sec. 7.

Véase, Rodríguez v. Pérez Santiago, *supra*; E.L.A. v. Cole, res. el 13 de abril de 2005, 164 D.P.R. ___ (2005), 2005 TSPR 46, 2005 JTS 55; Colón v. Glamourous Nails, res. el 3 de febrero de 2006, 167 D.P.R. ___ (2006), 2006 TSPR 16, 2006 JTS 25; Ortiz Andújar v. E.L.A., 122 D.P.R. 817

(1988); Asoc. Fcias. Com. v. Depto. de Salud, 157 D.P.R. 76 (2002).

El concepto de equidad en nuestro sistema de Derecho se encuentra recogido en el artículo antes mencionado. "[L]a equidad implica más que una justicia estrictamente legal, una justicia de tipo natural y moral". J. Castán Tobeñas, *Derecho Civil Español, Común y Floral*, 11ma Ed., Madrid, Editorial Reus S.A., 1975, Tomo 1, Vol. 1, pág. 483. El principio de equidad en nuestro derecho se ha basado en el concepto aristotélico de la mitigación de la ley mediante la equidad para hacer la ley justa. Silva v. Comisión Industrial, 91 D.P.R. 891, 900 (1965). La equidad nació precisamente de la necesidad de atemperar el rigor de la norma mediante recurso a la conciencia del juzgador. Rodríguez v. Pérez Santiago, res. el 14 de abril de 2004, 161 D.P.R. ___, 2004 TSPR 57, 2004 JTS 66, *citando a* Banco Metropolitano v. Berríos, 110 D.P.R. 721 (1981). Reiteradamente hemos expresado que "la equidad remite el proceso decisional al mundo puro de los valores en busca de la recta razón y del tuétano racional y moral del Derecho donde reside el valor supremo de justicia". Cruz Cruz v. Irizarry Tirado, 107 D.P.R. 655, 660 (1978).

Con relación al principio de equidad, José Castán Tobeñas expresa que

> [l]as ideas de justicia y equidad son esenciales y consustanciales a la noción del Derecho, el cual dejaría de cumplir sus finalidades morales y sociales si no aspirase a realizar la justicia, y no una justicia abstracta y teórica, sino una justicia realista y humana. El juez debe

> obediencia a la ley, y la mejor manera de servirla es la de realizarla en su idea animadora, esto es en la justicia, que constituye su más profundo contenido. J. Castán Tobeñas, *La formulación judicial del derecho: jurisprudencia y arbitrio de equidad*, Segunda Ed. Revisada, Madrid, Ed. Reus, 1954, pág. 2527.[8]

Como señalamos anteriormente, en el singular caso que tenemos ante nuestra consideración, el Departamento solicitó voluntariamente que se le concediera el control absoluto y sin limitaciones de las facilidades médico-hospitalarias que administraba SIMAH. Para el momento en que se presentó esta petición, tanto el Departamento como CMI habían comparecido como acreedores de SIMAH ante el Tribunal de Quiebras y el Departamento estaba al tanto del contrato de arrendamiento vigente. Conociendo la obligación que representaba dicho contrato, el Departamento continuó administrando y controlando las facilidades, sin oponerse al mismo.

Surge del expediente que CMI solicitó al Departamento que le devolviera los equipos o le pagara el correspondiente canon de arrendamiento. Dicha solicitud fue ignorada, a pesar de que el Departamento continuó utilizando la maquinaria. Por otra parte, surge además que el Departamento continúo pagando la renta de las facilidades y el salario de los empleados que trabajaban allí por ser indispensables para operar los servicios médico-hospitalarios en cuestión. En sintonía con lo

---

8 Véase, además, <u>López v. Atlantic Southern Ins. Co.</u>, 158 D.P.R. 562, 579-80 (2003).

anterior, es claro que debía pagar también la renta del equipo, por ser éste igualmente indispensable para lograr los fines procurados por el Departamento. Debe recordarse que el equipo referido pertenecía a CMI, cuyo negocio consistía precisamente de alquilar dicho equipo a entidades como SIMAH o como el Departamento.

Claro está, es menester tomar en cuenta que el Departamento solicitó administrar las facilidades en cuestión, procurando promover el bienestar común, para proveer servicios médicos esenciales a las comunidades afectadas. Fue también motivo sustancial de su actuación evitar que se perdieran las licencias y certificaciones federales, como por ejemplo la de Medicare. Además, es importante recalcar que la transferencia del equipo se hizo como parte del procedimiento judicial ante el Tribunal de Quiebras. Tomando estos factores en consideración, forzoso es concluir que, aunque el Departamento tiene la responsabilidad de pagar una renta por el equipo, no podemos imponerle el mismo canon establecido en el contrato entre SIMAH y CMI, que era de $17,000 mensuales, y que resultó de las negociaciones puramente comerciales entre dichas partes. No sólo sería excesivamente oneroso para el ELA pagar tal canon, sino que debe considerarse también que a CMI le conviene que el Departamento se haga cargo de continuar el arriendo del equipo en cuestión.

Por los fundamentos expuestos, procede confirmar en parte la sentencia del Tribunal de Apelaciones en cuanto al

deber del Departamento de pagar algún canon de arrendamiento razonable por el uso del equipo en cuestión y revocar en parte en cuanto al monto de los cánones adeudados. Procede devolver el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que determine la cantidad a desembolsar tomando en consideración cuál sería el canon que el Departamento hubiese acordado pagar de haber negociado dicho contrato, el estado de depreciación de los equipos, y otras consideraciones pertinentes.

Se dictará una sentencia conforme a lo resuelto aquí.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

CMI Hospital Equipment
Corp.

    Recurrido

        vs.                 CC-2005-434     Certiorari

Departamento de Salud,
Estado Libre Asociado de
Puerto Rico; Etc.

    Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 30 de mayo de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirma en parte la sentencia del Tribunal de Apelaciones, Región Judicial de San Juan, en cuanto al deber del Departamento de pagar algún canon de arrendamiento razonable por el uso del equipo en cuestión y revocar en parte en cuanto al monto de los cánones adeudados.

Se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que determine la cantidad a desembolsar tomando en consideración cuál sería el canon que el Departamento hubiese acordado pagar de haber negociado dicho contrato, el estado de depreciación de los equipos, y otras consideraciones pertinentes.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López y la Juez Asociada señora Rodríguez Rodríguez concurren sin opinión escrita. El Juez Asociado señor Rivera Pérez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo